554 F.Supp. 93 (1982)
Doris A. WESLEY, Plaintiff,
v.
MONSANTO COMPANY, Defendant.
No. 81-1118C(C).
United States District Court, E.D. Missouri, E.D.
December 13, 1982.
*94 Charles Sindel, Clayton, Mo., for plaintiff.
Arthur Smith, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
REGAN, District Judge.
Included in Monsanto Company's package of employee benefits is its non-contributory, self-administered Disability Income Plan. That Plan provides, inter alia, for payments by Monsanto for not more than 30 months to employees who have been determined by Monsanto's Department of Medicine and Environmental Health, on the basis of medical evidence furnished to it, to be totally and temporarily disabled "from performing substantially all of the duties pertaining to his position ... or any other appropriate work assigned to him for which he is reasonably trained or educated."
In this action, removed from the state court, recovery is sought for disability benefits allegedly due plaintiff under Monsanto's Disability Income Plan. We have jurisdiction under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B) and (e)(1) and 28 U.S.C. § 1441(b).
Initially, plaintiff vigorously contested defendant's right of removal and sought remand on the contention that plaintiff was not suing under ERISA, but was merely claiming damages for breach of her employment contract resulting from defendant's alleged failure to pay the agreed disability benefits. She has since retreated from that position by filing an amended complaint in which recovery is expressly sought under ERISA not only for disability benefits but also for damages under 29 U.S.C. § 1132(c) and for an attorney's fee under 29 U.S.C. § 1132(g).
Plaintiff, a young woman in her 20s, was employed by Monsanto Company in November, 1977 as a telecommunications delivery clerk. The basic function of such clerks is *95 to remove incoming messages from the telex machine and deliver them periodically to one or more buildings on one of defendant's two "campuses." Elevators are available for use if desired. There is an irreconcilable conflict in the evidence as to the length of time a delivery clerk is normally required to walk during each hour while performing her duties. We have resolved that dispute by accepting defendant's evidence.
Beginning in the latter part of October, 1980, plaintiff began experiencing chest pains, which she claims were exacerbated by the amount of walking required of her. In early November, 1980, she was sent to St. John's Mercy Hospital by Dr. Saffa, a physician in Monsanto's dispensary. At St. John's plaintiff had an EKG and chest x-ray and underwent an echocardiogram which was negative. The following week, again complaining of chest pains, plaintiff was sent home.
In mid-November plaintiff's family physician referred her for evaluation to Dr. William Phillips, a cardiologist. He, in turn, hospitalized her at St. Luke's Hospital for further tests and procedures. Upon her discharge on November 20, 1980, Dr. Phillips diagnosed plaintiff's condition as mitral valve prolapse with mid systolic click and murmer,[1] with the notation that he would see her on a yearly basis for evaluation. In his discharge summary, Dr. Phillips stated that "(Plaintiff) noted she did a great deal of walking and exercise at her job at Monsanto and she is therefore recommended she try to get into a situation at work that would involve less strenuous activities." Following plaintiff's discharge, Dr. Phillips wrote a note (on a prescription blank) authorizing her return to work the following Monday, November 24, 1980, with the recommendation that she be given "a lighter form of work activities than what she has done on her present job." He based this suggestion on representations made by plaintiff that she was required to run from building to building and up steps with heavy packages. These representations do not accord with the facts.
Upon plaintiff's return to Monsanto on November 24, 1980, she was assigned on a half day basis to her regular job duties of sorting and delivering messages and to spend each afternoon working in the office while sitting down. She continued to complain of chest pains even while sitting, and finally on December 5, 1980, her supervisor sent her home. Thereafter, Dr. Phillips arranged for plaintiff to be examined by another cardiologist, Dr. Alan Weiss. Dr. Weiss examined her on December 31, 1980, following which he caused her to be admitted to Barnes Hospital for further tests and procedures. On January 9, 1981, Dr. Weiss wrote a note to Monsanto in which he expressed no opinion as to whether plaintiff was disabled, commenting only that she had mitral valve prolapse and that her pain was difficult to control.
During the several months following December 5, 1980, defendant sought on a number of occasions to obtain from plaintiff's doctors definitive information as to the extent to which plaintiff was disabled from performing her job duties. Both Drs. Phillips and Weiss were requested to complete a special placement questionnaire to enable defendant to determine whether plaintiff's condition was such as to disable her from working. Included in the data requested to be furnished were what, if any, specific limitations should be placed on the employee's walking, climbing stairs, carrying, lifting, stooping, squatting and bending, as well as any other limitations on her ability to work, with a place for the doctors to comment further.
Neither doctor answered the questionnaire, Dr. Weiss for the asserted reason that plaintiff was not his patient (and that he was answerable only to Dr. Phillips) and *96 Dr. Phillips for no apparent reason. He responded only by a letter dated April 13, 1981 in which he simply expressed the "hope" that Monsanto "will be able to find (plaintiff) a position that does not require significant external physical activity as this will cause exacerbation of her chest pain." He also stated that plaintiff's pain was musculoskeletal in origin. He had previously concluded that plaintiff showed no evidence of coronary disease.
After receipt of the April 13 letter, defendant sought in vain to obtain from Dr. Phillips his opinion as to plaintiff's ability to perform her job, following which plaintiff was examined on April 23, 1981 at defendant's request by Dr. Chester P. Lynxwiler, a physician in Monsanto's Medical Center. Dr. Lynxwiler concurred in the diagnosis of mitral valve prolapse with no evidence of cardiac enlargement. In his opinion plaintiff "is not a cardiac cripple and certainly not totally disabled. She could return to work with limitations of minimal pushing, pulling and lifting and walking at her own rate at least 50% of the time." We find that immediately following the examination Dr. Lynxwiler informed plaintiff that he would recommend that she could return to work if his "restrictions" were honored.
On April 27, 1981, Monsanto's Administration and Personnel Manager, J.J. Ritterskamp, called plaintiff and assured her that if she returned to work, Monsanto would honor Dr. Lynxwiler's "restrictions" of which he had been informed. When plaintiff replied that she would go back only to another (entirely different) "lighter" job,[2] she was told that none was then available but that if she wished she could take a personal leave of absence, without pay, until such a job became available. She refused to do so. The following morning, Robert P. Elmiger, manager of Monsanto's Telecommunications Systems, telephoned plaintiff in an unsuccessful effort to persuade her to return to her job until another position more to her liking could be found, making it clear that in the interim Dr. Lynxwiler's job restrictions would be honored. Later that day, after Elmiger had determined (after personally walking the routes with some of the clerks and otherwise further investigating the job requirements) that it entailed less than 50% walking, Ritterskamp terminated plaintiff because of her refusal to return to work.
The parties are in agreement that an adverse decision of the administrator of an employee welfare plan is judicially reviewable only if the administrator acted arbitrarily and capriciously in the absence of substantial evidence. Quinn v. Burlington Northern Inc. Pension Plan, 664 F.2d 675, 678 (8 Cir.1981); Chastain v. Delta Air Lines, Inc., 496 F.Supp. 979, 982 (D.C.Ga. 1980). In our judgment, there is an entire want of credible evidence supportive of a finding that Monsanto's determination was made arbitrarily or capriciously. To the contrary, it was clearly made on a rational basis.
When her physician, Dr. Phillips released her in November, 1980, recommending a lighter form of work, defendant cut in half the amount of required walking and provided her with a sitting job for the balance of the time. When plaintiff still complained of pain defendant released her on medical leave, paying her 100% of her base salary, the amount specified in the Plan. It continued to pay her that amount for over four months, while attempting to obtain medical evidence from her physicians which would justify a finding that plaintiff was totally and temporarily (or permanently) disabled from substantially performing her job within the meaning of the Plan. As noted supra, Dr. Phillips, her cardiologist, carefully sidestepped expressing any opinion whatever as to whether plaintiff was disabled, going no further than to recommend that *97 she be given "a lighter form of work" (but refusing to amplify what he meant other than stating his "hope" that Monsanto would be able to find plaintiff a position that does not require "significant exertional physical activity."[3] And Dr. Weiss would not express any opinion to defendant on the crucial issue.
It was not until defendant's patience had been exhausted by its inability to obtain a qualified medical opinion from plaintiff's own physicians that plaintiff was required to undergo an examination by Dr. Lynxwiler. In his opinion, plaintiff was "certainly not totally disabled." And inasmuch as the overwhelming weight of the credible evidence demonstrates that plaintiff was expressly informed of the "restrictions" imposed by Dr. Lynxwiler and of Monsanto's agreement to "honor" them if she returned to work, we hold that defendant's action was neither capricious nor arbitrary.[4] We do not credit plaintiff's testimony that she was not aware of the nature of the "restrictions" nor of Monsanto's intent to honor them. At the very least, plaintiff should have returned to her job and thus tested both Monsanto's willingness to abide by the restrictions and her ability to perform under them.
Plaintiff urges, as evidence of arbitrary and capriciousness, the failure of defendant to comply with the provision of the Plan and the similar requirements of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1(f) to the effect that an employee whose claim for benefits has been denied shall be informed thereof in writing by a notice setting forth in an understandable manner the specific reasons for such denial. The Plan, as well as the statute and regulations also require that the employee be adequately informed of the review procedure and the steps to be taken to obtain an appeal of an adverse decision.
There is no question but that there was no compliance with the foregoing requirements. On the other hand, plaintiff never filed a written claim for disability benefits. Nevertheless, defendant paid her the benefits specified in the Plan until it determined there was no medical evidence of disability. Both parties proceeded informally. The first time plaintiff requested a claim form was after her termination, and that was through her attorney. As of that time, no reasonable person could have failed to understand that plaintiff was being denied benefits because there was an absence of medical evidence which would justify a finding that plaintiff was totally disabled. And inasmuch as the Plan mandated that the issue in the event of any appeal or review was to be resolved by Monsanto's Department of Medicine and Environmental Health (which had already made the original decision for Monsanto on the basis of all the evidence available to plaintiff), a review would have been futile.
In our judgment, defendant acted in good faith in seeking to obtain a bona fide medical opinion which would justify it in continuing to pay disability benefits to plaintiff. To the extent defendant's failure to comply with the procedures outlined in the Plan and the statute and regulations is relevant, the effect is merely to excuse plaintiff's failure to exhaust her administrative remedy,[5] particularly since plaintiff makes no contention that she had any evidence additional to that which she introduced at the trial of this case.
Finally, plaintiff seeks to recover the penalty authorized by 29 U.S.C. § 1132(c) to be assessed against an administrator who fails or refuses to furnish to a participant within 30 days after request therefor the information set forth in 29 U.S.C. § 1024(b)(4).
*98 The only documents requested by plaintiff (through her counsel) are claim forms, the relevant insurance policy, and copies of the medical benefits plan. There was no insurance policy coverage (and hence no insurance), and claim forms are not among the documents specified in the statute. And although Monsanto does have a "Medical Benefits Plan", that plan is not in any way pertinent to the present controversy. We note that in her amended complaint plaintiff claims she should be awarded damages based solely upon Monsanto's alleged failure to furnish her with a copy of defendant's "pension plan." A copy of the pension plan was never requested nor is it relevant.
A copy of Monsanto's Disability Income Plan, upon which plaintiff's claim is based, was never requested by plaintiff. The fact is that in accordance with defendant's regular practice and policy, plaintiff was supplied, at the time of her employment, with a copy of the Summary Plan Description which contained all the information she required in order to ascertain her entitlement to and to make a claim for disability benefits. We do not credit plaintiff's testimony that she did not receive a copy of the Summary.
Plaintiff has made no showing of prejudice by reason of defendant's failure to furnish her a copy of its Income Disability Plan and we find there was none. Cf. Shlomchik v. Retirement Plan of Amalgamated Insurance Fund, 502 F.Supp. 240 (D.C.Pa.1980). Whether an award under § 1132(c) should be made is left to the sound discretion of the Court. In the exercise of our discretion we decline to award any damages to plaintiff even if her attorney's request for a copy of Monsanto's Medical Benefits Plan suffices as a request for its Disability Income Plan.[6]
It follows that judgment should be entered in favor of defendant and against plaintiff. We decline, in the exercise of our discretion, to allow an attorney's fee to defendant. The foregoing memorandum opinion constitutes our findings of fact and conclusions of law.
NOTES
[1] Mitral valve prolapse, a condition found in 15 to 20 per cent of all healthy young women, is not of itself disabling. However, for reasons which "cardiologists haven't been smart enough to figure out" (in Dr. Phillips' words) a small minority of women found to have mitral valve prolapse experience chest pains of either short or lengthy duration but which in no event cause any long term ill effects. Plaintiff was one of this unfortunate minority.
[2] Plaintiff is inconsistent. She testified that she suffers the pain even while sitting, but that she was willing (and apparently able) to work in another (sitting) type of position. And although she claims her condition has not changed for the better, she has obtained unemployment compensation on the representation that she is willing and able to work (allegedly in a secretarial position which would require a great deal of sitting).
[3] In his deposition, Dr. Phillips testified that it was his opinion that plaintiff could continue on her job "provided she did not have the strenuous activity that she told (him) about", namely, that she was required to run from one building to another and up steps and often carrying heavy loads.
[4] Were we permitted to decide the issue de novo, we would have reached the same conclusion as Monsanto.
[5] In his letter of May 18, 1981, plaintiff's counsel expressed the same opinion.
[6] Although in his letter of October 6, 1981, defendant's counsel stated that he understood from the earlier correspondence of plaintiff's counsel that he wished to have a copy of the Disability Income Plan, there is no evidence that Monsanto so understood it, at least prior to October 6, 1980, and plaintiff claims no damages under § 1132(c) after that date.